IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DANIEL PENSE                                                    PLAINTIFF

V.                                    NO. 10-5072

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration                 DEFENDANT

## MEMORANDUM OPINION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a

decision of the Commissioner of the Social Security Administration (Commissioner) denying

his claims for a period of disability and disability insurance benefits (DIB) and supplemental

security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security

Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence

in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

## I.      Procedural Background:

Plaintiff filed his applications for DIB and SSI on January 15, 2008 (Tr. 103-107),

alleging an inability to work since August 17, 2007, due to pain in his lower back.  (Tr. 125,

129).  An administrative hearing was held on May 11, 2009, at which Plaintiff appeared with

counsel.  (Tr. 5-29).

By written decision dated October 6, 2009, the Administrative Law Judge (ALJ) found

Plaintiff had an impairment or combination of impairments that were severe - Lumbago.[1]  (Tr.

39).  However, after reviewing all of the evidence presented, he determined that Plaintiff's

---

[1]Lumbago - Pain in the lumbar region.  Dorland's Illustrated Medical Dictionary 1092 (31st ed. 2007).

-1-

impairments did not meet or equal the level of severity of any impairment listed in the Listing

of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 42). The ALJ found that

Plaintiff had the residual functional capacity (RFC) to:

> occasionally lift or carry 20 pounds and 10 pounds frequently. He can sit for 6 hours in
> an 8-hour workday, in 2 hour time blocks, without interruption. He can stand or walk
> for 6 hours in an 8-hour workday, in 2 hour time blocks without interruption. He can
> frequently climb, balance, stoop, kneel and crouch.

(Tr. 43). With the help of a vocational expert (VE), the ALJ determined that Plaintiff could

perform his past relevant work as a logging/mud analyst. (Tr. 47).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which

denied that request on March 24, 2010. (Tr.1-3). Subsequently, Plaintiff filed this action. (Doc.

1). This case is before the undersigned pursuant to the consent of the parties. (Doc. 5). Both

parties have filed appeal briefs, and the case is now ready for decision. (Docs. 7, 8).

## II.    Evidence Presented:

Plaintiff was born in 1983 and completed the twelfth grade in school. (Tr. 125, 133).

He performed work as a janitor/route manager from January 2002 to July of 2005, and most

recently, as a logging analyst, from July of 2005 to October of 2007. (Tr. 145). Plaintiff began

having back pain in 2007, and on June 13, 2007, reported such pain to his treating physician at

the time, Dr. C.R. Magness. (Tr. 228, 243). Dr. Magness diagnosed him with Lumbago. (Tr.

228). Also in June of 2007, Plaintiff was seen by an ear, nose and throat physician, Dr. Lance

A. Manning, upon referral by Dr. Magness. (Tr. 236). Dr. Manning noted that Plaintiff had been

using Afrin chronically for a long period of time. He discussed long term Afrin use with

Plaintiff, and developed a schedule for him to wean off the Afrin. (Tr. 236). In a follow-up

AO72A
(Rev. 8/82)

appointment with Dr. Manning, Plaintiff reported that although he tried to wean off of the Afrin slowly, he was unable to do so. (Tr. 239). Dr. Manning again encouraged Plaintiff to wean off his Afrin. (Tr. 240).

On July 12, 2007, three x-ray views of Plaintiff's lumbar spine were taken. (Tr. 242, 393). They showed normal vertebral alignment with five lumbar type vertebrae, the disc spaces were of uniform height, and the impression was recorded as "Unremarkable limited lumbar spine series." (Tr. 242, 393).

From August 2007 to November 23, 2007, Plaintiff participated in physical therapy at Yumang Rehab Services P.A. (Tr. 190-223, 302-332). On October 25, 2007, a letter was written by the physical therapist, stating that Plaintiff was about 70% of the way through his rehabilitation, and was still experiencing some weakness in his back. She further stated that he needed to continue his treatments for approximately three weeks.

Between August 20, 2007 and November 19, 2007, Plaintiff continued to be treated by Dr. Magness, reporting on November 19, 2007 that there was no improvement with physical therapy. (Tr. 226). Dr. Magness then diagnosed Plaintiff with Arthritis and Lumbago. Also on November 19, 2007, a Rheumatoid Arthritis Diagnostic Panel was performed, which was interpreted as follows: "These serologic results may be found in 10-20% of patients with polyarthritis that is clinically and radiologically indistinguishable from RA." (Tr. 245).

Plaintiff received physical therapy again between November 27, 2007 and January 2, 2008, at Yumang Rehab Services P.A., and by letter dated January 2, 2008 to Dr. Magness, the physical therapist stated that Plaintiff wanted to discharge services secondary to financial concerns. (Tr. 392). Plaintiff reported to the physical therapist a 50 percent improvement in low

AO72A
(Rev. 8/82)

back pain until he had a motor vehicle accident in December of 2007.  He reported that his pain

was "4/10 on a numerical scale with pain medication" and that he was still unable to work.  (Tr.

392).

In early 2008, Plaintiff reported to Dr. Magness that his medications were stolen, and he

requested a refill eleven days early.  (Tr. 346, 397).  On February 19, 2008, Plaintiff reported to

Dr. Magness that he spilled some of the medications and needed a refill.  (Tr. 348).

On February 27, 2008, Plaintiff underwent a General Physical Examination by Dr. Neil

D. Mullins.  (Tr. 334-339).  Dr. Mullins noted that Plaintiff walked on his heel and toe poorly

and had 75% grip in his hands.  He diagnosed Plaintiff with:

1. Chronic complaint of L-S pain
2. Possible some osteoarthritis in hips.

(Tr. 338).  He also found no limitation in Plaintiff's ability to walk, stand, sit, lift, carry, handle,

finger, see, hear or speak.  (Tr. 338).

On March 10, 2008, Dr. Magness noted that Plaintiff had slipped and fallen at Walmart

one and ½ week prior thereto, and in March and April of 2008, Plaintiff complained of left leg

pain and chronic pain to Dr. Magness.  (Tr. 347, 396).

On May 1, 2008, Plaintiff visited the Northwest Arkansas Free Health Clinic (free clinic)

complaining of back pain, and on May 3, 2008, a MRI Spine Lumbar without Contrast was

performed on Plaintiff at Washington Regional Medical Center.  (Tr. 352, 360, 365, 373, 386).

The impression was mild bilateral facet hypertrophy at L4-L5 and L5-S1.  Otherwise, it was a

normal lumbar spine MRI.  (Tr. 352, 360, 365, 373, 386).  Plaintiff received physical therapy at

the free clinic, and it was noted on May 8, 2008, that Plaintiff still had a very antalgic gait.  (Tr.

AO72A
(Rev. 8/82)

358).  On May 22, 2008, Plaintiff reported that he was getting out a little more and was walking a little further.  (Tr. 357).

On June 9, 2008, a urine drug screen given by Dr. Magness proved positive for opiates. (Tr. 344).  On July 3, 2008, Plaintiff told Dr. Magness that he knocked his pain pills into the sink.  (Tr. 389).  On July 31, 2008 and August 14, 2008, Plaintiff reported to the free clinic that pain was still very much an issue, and reported little to no improvement with physical therapy. (Tr. 367-368).

On September 12, 2008, Dr. Magness reported that he could no longer help Plaintiff with his pain and that Plaintiff had demonstrated "excessive opiate use."  (Tr. 387).  Plaintiff then began seeing Dr. Lawrence Schemel with his back pain.  Dr. Schemel found that Plaintiff had normal range of motion in his neck, that his shoulders were normal, there was no upper back tenderness or fibromyalgia type trigger points, that he had some tenderness and spasm in his lower back, and that  his range of motion was good "but he limits forward flexion due to guarding."  He also found that Plaintiff's hips had a normal range of motion.  (Tr. 381).  Dr. Schemel diagnosed Plaintiff with Lumbago, and would not refill the Hydrocodone.  (Tr. 381). He wanted Plaintiff to try the Fentanyl patch and to stop the over-the-counter pain medications and Lyrica.  Dr. Schemel noted that Plaintiff agreed that he would not get pain medications from other sources and that there would be periodic drug screens to ensure compliance.  He also reported that there would be no early medicine refills.  (Tr. 381).

On October 3, 2008, Plaintiff reported to Dr. Schemel that the Fentanyl patch worked for two days , but the third day was "bad."  (Tr. 380).  On November 3, 2008, Dr. Schemel noted that Plaintiff had an ESI (Epidural Steroid Injection) the prior week and that it had improved his back

AO72A
(Rev. 8/82)

pain.  (Tr. 379).  He felt like he would be able to get back to work.  Dr. Schemel noted that

Plaintiff planned to have an ESI every 3-4 months.  (Tr. 379).  On November 4, 2008, Dr.

Schemel released Plaintiff to return to work, with no physical restrictions, but stated that he

needed to avoid heavy equipment and dangerous work environments.  (Tr. 378).

On January 6, 2009, Plaintiff saw Dr. Schemel, and was reported as having been in the

hospital with a kidney stone.  The stone passed after 48 hours and his acute pain was not better.

(Tr. 377).  Plaintiff went back to work for four days, but had to stop because his back was

hurting.  (Tr. 377).  Dr. Schemel diagnosed Plaintiff with: kidney stone - resolved;

Hyperuricemia.[2]  (Tr. 377).

On January 20, 2009, Plaintiff told Dr. Schemel he wanted to get off of his pain

medications, and said his low back had been better since he passed the kidney stone.  (Tr. 376).

Dr. Schemel diagnosed Plaintiff with low back pain and narcotic withdrawal.  (Tr. 376).  They

discussed stopping the medications, and Plaintiff was to take Clonidine and use Tylenol for pain,

and Flexeril.  (Tr. 376).

On February 12, 2009, Plaintiff went to the free clinic, complaining of left shoulder pain

and lower back pain.  (Tr. 366).  His gait was reported as normal and he was diagnosed with left

shoulder tendinitis and chronic low back pain.  (Tr. 366).

On February 14, 2009, a CT brain without contrast was performed.  There was no

evidence for acute intracranial abnormality, and there was a right maxillary sinus polyp.  (Tr.

384).

--------

[2]Hyperuricemia - Excess of uric acid or urates in the blood; it is a prerequisite for the development of gout and
may lead to renal disease.  Id. at 911.

-6-

On March 13, 2009, Plaintiff saw Dr. Schemel for medication for back pain. (Tr. 369). Plaintiff told Dr. Schemel that he did not plan to get a job but planned to donate plasma to get some money. (Tr. 369). He also told Dr. Schemel that he was seen at the free clinic for his back pain and they gave him meloxicam, but it was not helping. (Tr. 369). Dr. Schemel diagnosed Plaintiff with low back pain, "symptom amplification vs. frank malingering." (Tr. 369). Dr. Schemel reported that Plaintiff said he was drinking "poppy seed tea and that might show up in a drug test." (Tr. 369). Dr. Schemel indicated that a Psychiatric evaluation might "help make a difference," and recommended that Plaintiff continue to avoid narcotic pain medications. (Tr. 369).

On June 16, 2009, a Mental Diagnostic Evaluation was conducted by Ronald E. McInroe, Psy.D., at the request of the ALJ. (Tr. 408-411). Dr. McInroe noted that there was a constricted quality to Plaintiff's affect and a "dysphoric quality to his mood."[3] (Tr. 410). Plaintiff told Dr. McInroe that he was not taking any prescribed medication for pain management, but that he "drank tea" as a way of helping him control his lower back pain. (Tr. 410). Dr. McInroe stated that Plaintiff demonstrated some indications of Alexithymia,[4] and that his depressive symptomatology appeared to be more demonstrated through irritability of mood. (Tr. 411). He diagnosed Plaintiff as follows:

Axis I:          Dysthymic Disorder
Axis II:         No diagnosis
Axis V/GAF - 64

(Tr. 411). Dr. McInroe concluded:

---

[3]Dysphoric - pertaining to or characterized by dysphoria. Id. at 587.
 Dysphoria - disquiet; restlessness; malaise. Id.

[4]Alexithymia - Inability to recognize or describe one's emotions. Id. at 48.

AO72A
(Rev. 8/82)

It is the examiner's opinion that this individual has the capacity to interact in a socially adequate manner. He also has the capacity to communicate in an intelligible and effective manner. He also appears to have the capacity to cope with the typical mental cognitive demands of basic work related tasks. He does demonstrate mild deficits in attending and concentrating and also appears to demonstrate mild deficits of persistence. He may demonstrate mild deficits in the ability to complete work related tasks within an acceptable manner.

It is the opinion of the examiner that the claimant gave an honest and accurate representation of activities of daily living.

(Tr. 411).

In a Medical Source Statement of Ability to do Work-Related Activities (Mental) dated June 24, 2009, Dr. McInroe found that Plaintiff had no restriction for understanding and remembering simple instructions; carrying out simple instructions; and the ability to make judgments on simple work-related decisions. (Tr. 412). He further found that Plaintiff had only mild restriction in understanding and remembering complex instructions, carrying out complex instructions, and the ability to make judgments on complex work-related decisions. (Tr. 412). Finally, Dr. McInroe found that Plaintiff's ability to interact appropriately with supervision, co-workers, and the public as well as respond to changes in the routine work setting were not affected by his impairments, and that there were no other capabilities which were affected by the impairments. (Tr. 413).

In a January 22, 2008 report, Plaintiff reported that his pain was located in his lower back and sometimes his upper back and thighs. He stated that he could stand/walk 30-45 minutes and sit for 1 hour. (Tr. 135). At that time, he was taking Darvocet and Flexeril. (Tr. 136). With respect to his daily activities, Plaintiff reported on January 22, 2008, that he woke up, took pain medicine, ate breakfast, sat and watched television, got up and stretched, maintained his apartment if needed, went to town if needed, ate supper, took pain medicine, watched television,

-8-

and went to sleep.  (Tr. 137).  He reported that he could not do heavy lifting, run, sit for long periods of time, or play sports with friends.  (Tr. 138).  He indicated that he could perform personal care, although painful at times, prepare his own meals, do the dishes, sweep, mop when needed, vacuum when needed, and with the help of his brother and stepfather, do the laundry when needed.  (Tr. 139).  He reported that he tried to get out of the house daily and when he drove, he only drove short distances.  He could shop for groceries, play board games and games over the internet with others.  (Tr. 141).  He reported that he could pay attention for 2 hours, finish what he started, and follow written instructions well.  (Tr. 142).  He also reported that he got along with authority figures pretty well, but handled stress badly.  (Tr. 1434).

In a Field Office Disability Report dated April 23, 2008, it was reported that Plaintiff had difficulty with sitting, standing and walking , walked slowly and with a dramatic limp, and had trouble getting up and down from the chair.  (Tr. 154).  In an undated Disability Report - Appeal, Plaintiff stated that he felt like his pain was getting worse because he was having to take more pain medication, and that he was having trouble walking without losing his balance.  (Tr. 156).  At that time, he was taking Celexa for depression, Flexeril for pain and Hydrocodone for pain.  (Tr. 158).  He stated that he only took a shower once a week because it hurt to get into the bath, and that he did not do anything any more.  (Tr. 159).

At the hearing held on May 11, 2009, Plaintiff stated that he was able to stand about an hour before he was uncomfortable, and that there were times when the pain was barely noticeable.  (Tr. 15).  He stated that sitting after a long period of time caused pain, and that the pain would start as a small ache and then would feel like someone was sticking a pin in him.  (Tr. 16).  He testified that he had a bad day once a week.  (Tr. 17).  Plaintiff reported that he lived

with his mother, who moved in with him to help him pay bills and take care of things until he could get well.  (Tr. 21).  At the time of the hearing, he reported he was taking Celexa, Effexor, Meloxicam and Trazodone.   (Tr. 22).   He reported that Dr. Schemel suggested he get psychological testing, but he did not go because he did not know if he could afford it.  (Tr. 23-24).

**III.    Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A),

-10-

1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC).  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**IV.   Discussion:**

**A.  Impairments:**

The ALJ found that Plaintiff's Lumbago was a "severe impairment."  He further found that the record established that Plaintiff was also treated for seasonal allergic rhinitis, oral ulcerations and depression, but that these conditions were not "severe" because the medical evidence established that, whether considered singly or in combination with other impairments, they were only slight abnormalities and would have no more than a minimal effect on Plaintiff's

-11-

ability to perform work.

As noted by the ALJ, Dr. Manning, the ear, nose and throat specialist, concluded that Plaintiff's oral ulcerations had healed nicely and resolved.    He further found that Plaintiff's nasal septal deformity was not a primary problem and that Plaintiff should wean himself off of Afrin.

With respect to Plaintiff's depression, Plaintiff did not allege disability due to depression, which is significant.  See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); see also Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003).  The record reflects that it was managed with prescription medication prescribed by his general treating physician, and that he had not engaged in counseling.  Furthermore, Dr. McInroe concluded that Plaintiff had a dysthymic disorder which was primarily demonstrated through irritability.  As the ALJ noted, Plaintiff was also not completely forthcoming with Dr. McInroe, because he failed to tell Dr. McInroe that he drank tea "from poppy seeds."

The Court finds the ALJ properly addressed all of Plaintiff's impairments, alone and in combination, and that there is substantial evidence to support his finding that only Plaintiff's Lumbago is severe.

**B. Failure to Fully Develop the Record:**

Plaintiff argues that the ALJ's failure to order a Physical RFC Assessment and to have a Psychiatric Review Technique form completed resulted in him failing to fully develop the record in this case.

The ALJ has a duty to fully and fairly develop the record.  See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995);  Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000).  This can be

AO72A
(Rev. 8/82)

done by re-contacting medical sources and by ordering additional consultative examinations, if necessary. <u>See</u> 20 C.F.R. § 404.1512. The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1016 (8th Cir. 2010). However, the ALJ is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. <u>See</u> <u>Shannon v. Chater</u>, 54 F.3d 484, 488 (8th Cir. 1995)("reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial"). The ALJ is only required to re-contact medical sources "whenever the evidence the ALJ receives from a claimant's medical source is inadequate to determine whether the claimant is disabled." <u>Bond v. Astrue</u>, 2008 WL 2328346, at *3 (W.D. Ark. 2008).

In the present case, the Court believes that although there is not a Physical RFC Assessment in the record, there is nevertheless sufficient medical evidence in the record for the ALJ to determine whether Plaintiff is disabled. Plaintiff's first treating physician, Dr. C.R. Magness, treated Plaintiff for his back pain until September 12, 2008, when he concluded that he could no longer help him with his pain and that Plaintiff had demonstrated excessive opiate use. Dr. Mullins' general physical examination on February 27, 2008 revealed that although Plaintiff walked on his heel and toe poorly, there was no limitation in Plaintiff's ability to walk, stand, sit, lift, carry, handle, finger, see, hear or speak. Plaintiff's subsequent treating physician, Dr. Lawrence Schemel, released Plaintiff to return to work on November 4, 2008, with no physical restrictions other than a need to avoid heavy equipment and dangerous work environments. Dr. Schemel also reported in January of 2009 that Plaintiff's low back was better since he passed the kidney stone. Dr. Schemel also noted that Plaintiff did not plan to get a job, but planned to donate plasma for money, and that Plaintiff needed a psychiatric evaluation. The

-13-

free clinic reported on February 12, 2009 that Plaintiff's gait was normal.  An MRI of Plaintiff's lumbar spine revealed no significant degenerative disc disease, no canal stenosis or neural foraminal narrowing, and only mild bilateral facet hypertrophy was present at L4-L5 and L5-S1. The Court believes that Dr. Mullin's assessment that Plaintiff suffered from **no** limitations in his ability to walk, stand, sit, lift, carry, handle, finger, see, hear or speak, coupled with all of the other evidence in the record, supports the ALJ's finding that Plaintiff could do light work with limitations.  Therefore, there was sufficient evidence in the record for the ALJ to determine that Plaintiff's lumbago was not disabling, without requiring a physical RFC assessment.

With respect to the request for a Psychiatric Review Technique, as stated earlier, it is important to note that Plaintiff did not raise depression as a disabling impairment.  Nevertheless, the ALJ sent Plaintiff to undergo a consultative Mental Diagnostic Evaluation with Dr. McInroe. Even though Dr. McInroe found Plaintiff demonstrated mild deficits in attending and concentrating and also appeared to demonstrate mild deficits of persistence and in the ability to complete work related tasks within an acceptable manner, he nevertheless found that Plaintiff had the capacity to interact in a socially adequate manner, to communicate in an intelligible and effective manner, and to cope with the typical mental cognitive demands of basic work related tasks.[5]

The Court finds the record contains sufficient evidence for the ALJ to determine Plaintiff's mental capabilities, and that a Psychiatric Review Technique was not required.  The

---

[5]In addition, the record does not suggest there were any limitations caused by this nonsevere impairment and the ALJ was therefore not required to incorporate this mild deficit in the RFC or hypothetical to the VE.  See Hilkemeyer v. Barnhart, 380 F.3d 441, 447 (8th Cir. 2004)(ALJ's decision not to incorporate a mild pulmonary dysfunction in the RFC or hypothetical posed to the VE was not error because the record did not suggest there were any limitations caused by the nonsevere impairment).

-14-

Court finds the ALJ fully and fairly developed the record.

**B. Subjective Complaints and Credibility Analysis:**

In assessing Plaintiff's subjective complaints, the ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints, including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit observed, "our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). In the present case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment.

After reviewing the record, the Court finds that the ALJ properly evaluated Plaintiff's subjective complaints. In determining Plaintiff's RFC, the ALJ stated that he considered all of the symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. As stated earlier, an x-ray taken in July 2007 was unremarkable, and a subsequent MRI conducted on May 3, 2008 was predominately normal, demonstrating only mild bilateral facet hypertrophy from L4 through S1, without evidence of significant degenerative disease, canal stenosis or neural foraminal narrowing. The

-15-

record documents apparent drug seeking behaviors while being treated by Dr. Magness, who discharged Plaintiff, stating that he could no longer help Plaintiff with his pain and that Plaintiff had demonstrated "excessive opiate use." A claimant's misuse of pain medication is a valid factor for the ALJ to consider that weighs against the claimant's credibility. See Harvey v. Barnhart, 368 F.3d 1013, 1015 (8th Cir. 2004)(finding that the evidence showed that the plaintiff's physician's did not find him to be credible, as they noted his drug-seeking behavior was out of proportion to medical findings). In addition, Dr. Schemel ordered urine drug screening and recommended a psychological evaluation, and found Plaintiff had a normal range of motion in his shoulders, upper back and hips, and good range of motion in his lower back. Even Dr. Schemel diagnosed Plaintiff with "symptom amplifications versus frank malingering." Thus, the Court believes there is evidence to support the fact that Plaintiff may have consciously attempted to portray limitations that were not actually present at the degree claimed in order to increase his chance of obtaining benefits.

The Court finds that the ALJ fully and properly considered Plaintiff's subjective complaints.

**C. Whether Plaintiff retained the RFC to Perform His Past Relevant Work:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The

-16-

Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, the ALJ considered the medical assessments of examining agency medical consultants, Plaintiff's subjective complaints, and his medical records when he determined Plaintiff could perform light work with limitations. This determination was consistent with the ALJ's conclusion that Plaintiff would be able to return to his past relevant job as a logging analyst, which is considered light work in the Dictionary of Occupational Titles 010.281-022.

Therefore, after reviewing all of the evidence in the record, the Court finds substantial evidence to support the ALJ's RFC findings.

## V.    Conclusion:

Based upon the foregoing, the Court affirms the ALJ's decision and dismisses Plaintiff's case with prejudice.

IT IS SO ORDERED this 13th day of April, 2011.

/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-17-